[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15446
_____

D.C. Docket No. 6:15-cv-00254-GAP-TBS


SOUTHERN ATLANTIC COMPANIES, LLC,
a Florida limited liability company,
EDWARD HUTCHINS,
an individual,
RAYMOND MCINTOSH,
an individual,

                                        Plaintiffs - Appellants,

SOUTHERN ATLANTIC ELECTRIC COMPANY, INC.,
a Florida corporation,

                                        Plaintiff,

versus

SCHOOL BOARD OF ORANGE COUNTY, FLORIDA,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 14, 2017)

Before JORDAN and JULIE CARNES, Circuit Judges, and VINSON,[*] District Judge.

PER CURIAM:

Southern Atlantic Companies, LLC, appeals the summary judgment entered by the district court on its First Amendment retaliation claim. Southern Atlantic argues that the district court erroneously concluded that it failed to establish municipal liability under 42 U.S.C. § 1983. Edward Hutchins and Raymond McIntosh, officers of Southern Atlantic, appeal the award of attorneys' fees entered against them under 42 U.S.C. § 1988 on their First Amendment retaliation claims. After a careful review of the record, and with the benefit of oral argument, we affirm.

## I

Because we write for the parties, we set out only what is necessary to explain our decision.

## A

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

2

Southern Atlantic is an electrical subcontractor, and Mr. Hutchins and Mr. McIntosh are its vice president and president, respectively. The School Board of Orange County contracted with Wharton-Smith, Inc., to serve as the construction manager on a renovation project. Wharton-Smith solicited bids for the project. After Wharton-Smith selected Southern Atlantic's bid for the first phase of the project, but not the second, Southern Atlantic submitted a bid protest petition to the School Board. As part of the bid protest process, Southern Atlantic posted a bond in the amount of $127,920, which was issued by International Fidelity Insurance Company ("IFIC") in favor of the School Board.

The School Board invoked an indemnification provision in its contract with Wharton-Smith and tendered it the defense of the bid protest. Wharton-Smith defended the bid selection in an administrative hearing. On November 10, 2010, the administrative judge entered a recommended order finding that Wharton-Smith, and not the School Board, had selected the winning bid. As a result, Southern Atlantic lacked standing to maintain its bid protest against the School Board. Although the School Board had sought an award of attorneys' fees and costs, the recommended order did not mention the request. The School Board adopted the recommended order on February 8, 2011.

Meanwhile, in December of 2010, Southern Atlantic sued Wharton-Smith in Florida state court for refusing to award it the electrical subcontract. The state

3

court granted Wharton-Smith summary judgment a few years later, and the state appellate court affirmed.

On February 24, 2011, the School Board demanded that IFIC reimburse it approximately $40,000 for fees and costs incurred in connection with Southern Atlantic's bid protest. IFIC rejected the claim. The School Board responded that, to the extent IFIC's rejection was based on the fact that the School Board had not yet reimbursed Wharton-Smith for the bid protest defense, it would assign its claim for reimbursement to Wharton-Smith.

The School Board assigned Wharton-Smith its bond claim on August 2, 2011, and Wharton-Smith sued IFIC in state court the next day. Southern Atlantic intervened as a defendant. The state court ultimately entered summary judgment against Wharton-Smith in November of 2012. Following the entry of summary judgment, IFIC and Southern Atlantic moved for attorneys' fees against Wharton-Smith. The state court denied their motions. The state appellate court denied a similar motion by Southern Atlantic on appeal, and later affirmed the summary judgment on the merits.

**B**

Years of spinoff adversary proceedings at the administrative and state levels did not prevent this municipal bid protest from ending up in federal district court. A round of motions to dismiss pared down the complaint to First Amendment

4

retaliation claims asserted by Southern Atlantic, Mr. Hutchins, and Mr. McIntosh against the School Board. At its core, the plaintiffs' theory was that the School Board retaliated against them for speaking out about alleged irregularities in the bidding process (which had been handled by Wharton-Smith) by asserting a claim against the bid protest bond for legal fees and costs, and then assigning the claim to Wharton-Smith following IFIC's denial. *See, e.g.*, D.E. 30 at 14 ¶ 76; D.E. 70 at 15–16 (arguing, in response to the School Board's motion for summary judgment, that, "because of the School Board's attack and assignment of the [b]ond," "[Mr.] Hutchins and [Mr.] McIntosh had their company's [b]ond attacked, which resulted in a tarnished business reputation, sureties not consistently issuing bonds to [Southern Atlantic], a decreased bonding capacity . . . , and ultimately lost profits").

The School Board moved for summary judgment, and the district court granted its motions. With respect to Mr. Hutchins and Mr. McIntosh, the district court concluded that they had not suffered a retaliatory act because the School Board's alleged actions were directed at Southern Atlantic, and not at them individually. The district court also determined that they had not produced evidence of any alleged harm, such as reputational loss, inability to obtain a bond, or lost profits.

5

As for Southern Atlantic, the district court explained that its First Amendment retaliation claim, on the merits, survived summary judgment because there was evidence that the School Board had asserted an "unjustified bond claim" against it (by way of its surety, IFIC), "which had the effect of tying up the [b]ond" and causing damage. *See* D.E. 163 at 8. But the district court nonetheless granted the School Board summary judgment after concluding that Southern Atlantic had failed to establish municipal liability under § 1983. Specifically, the district court determined that Southern Atlantic had not demonstrated that the School Board's general counsel, Woody Rodriguez (who Southern Atlantic believed was the person responsible for making the claim against the bond and assigning the claim to Wharton-Smith), had been the School Board's final policymaker, as required by *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978).

Later, the district court awarded the School Board $18,983.60 in attorneys' fees under § 1988 against Mr. Hutchins and Mr. McIntosh, reasoning that their First Amendment retaliation claims had been meritless because they could not point to a retaliatory act directed at them. This appeal followed.

## II

We exercise plenary review over a district court's grant of summary judgment. *See Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). In doing so, we draw all inferences and review all of the evidence in the light most

6

favorable to the non-moving party. *Id.* The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of any material fact and that it is entitled to judgment as a matter of law. *Id.* If the evidence supporting the nonmoving party is merely colorable or not significantly probative, summary judgment may be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

We review an award of attorneys' fees under 42 U.S.C. § 1988 for abuse of discretion. *See Thompson v. Pharmacy Corp. of Am.*, 334 F.3d 1242, 1244 (11th Cir. 2003). We review a district court's determination that a claim is frivolous for abuse of discretion. *See, e.g.*, *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1179 (11th Cir. 2005) (reviewing for abuse of discretion whether a plaintiff's Americans with Disabilities Act claims were frivolous). Generally speaking, a district court abuses its discretion when it applies the wrong legal standard or commits a clear error of judgment. *See, e.g., Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).

## III

Southern Atlantic contends that the district court erred in concluding that the School Board could not be held liable under § 1983 for Mr. Rodriguez's decision to seek fees and costs against the protest bond on the School Board's behalf, and thereafter assign the claim to Wharton-Smith following IFIC's denial. A

7

municipality is not vicariously liable under § 1983 for the actions or omissions of an employee unless those actions "may fairly be said to represent [the municipality's] official policy." *Monell*, 436 U.S. at 694. Accordingly, "[m]unicipal liability attaches only where [a municipal] decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). *See also Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) ("Only those officials who have final policymaking authority may render the municipality liable under § 1983.").

No one disputes that neither state positive law, such as a statute, *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), nor official municipal policy, *see Monell*, 436 U.S. at 690 ("policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers"), vested the general counsel with final policymaking authority to assert and assign bond claims on behalf of the School Board. Southern Atlantic instead argues that Mr. Rodriguez held final policymaking authority because (a) the School Board had a custom of delegating final authority to its general counsel to settle legal disputes under $50,000, which allegedly would have included the bond claim since the fees and costs sought were under that amount; (b) the School Board's chairman, on behalf of the Board, had expressly delegated Mr. Rodriguez final policymaking authority over Southern Atlantic's request to have its bond returned; and (c) Mr.

8

Rodriguez was the School Board's *de facto* final policymaker because Southern Atlantic did not have a meaningful opportunity to seek the Board's review of his decision to assign the bond claim to Wharton-Smith.

## A

Southern Atlantic maintains that, pursuant to a longstanding Board practice, the general counsel possessed final authority to settle litigation under $50,000, "as well as other 'ministerial functions' like assigning [a] [b]ond." Br. of Appellants at 38 (quoting D.E. 59 at 149–150). Southern Atlantic asserts that, because the fees and costs sought against the bond totaled less than $50,000, Mr. Rodriguez had final policymaking authority over the alleged unconstitutional actions.

Assuming that the general counsel's alleged decision-making authority over settlements and assignments was so "permanent and well settled as to constitute a 'custom or usage' with the force of law," *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotation marks omitted), Southern Atlantic's argument fails because his authority is not plenipotentiary. And that is a problem for Southern Atlantic because, as the district court explained, our precedent makes it clear that a government employee is a final policymaker "only if his decisions have legal effect without further action by the governing body"—in this case, the Board—"and if the governing body lacks the power to reverse the

member or employee's decision." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) (internal quotation marks and citations omitted).

None of the record evidence cited by Southern Atlantic indicates that the School Board lacked the authority to override the general counsel's litigation decisions. To the contrary, the testimony cited by Southern Atlantic, *see* Br. of Appellants at 38 (citing D.E. 59 at 148–151), shows that the Board was responsible for setting policy, *see* D.E. 59 at 151 ("The [B]oard makes overall guiding policies . . . ."), and at all times retained the authority to micromanage litigation and overrule the general counsel's decisions, *see id.* at 151–152 (explaining that the Board retains decision-making authority over important legal matters). It therefore does not matter that the Board generally did not review the general counsel's litigation decisions.

What matters is that the Board *could* have intervened in the decision-making process and, as the entity vested with final policymaking authority, decided the matter. *See Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (holding that mayor was not the final policymaker for the city when he vetoed the city council's zoning decision because the city council could have overridden his veto, even though it never held a vote on the override). The alleged custom, even as characterized by Southern Atlantic, did not prevent the Board

10

from intervening and overriding the general counsel's decisions, so it remained the final policymaker.

## B

Southern Atlantic also contends that, at a so-called pre-agenda Board meeting, the chairman of the School Board, on behalf of the whole Board, expressly delegated final policymaking authority to the general counsel over all issues related to the protest bond. The district court rejected Southern Atlantic's characterization of what occurred, and we agree.

From the meeting's transcript, it is clear that the Board did not delegate final policymaking authority to the general counsel. Mr. Hutchins told the Board that Southern Atlantic had "put up a protest bond," and that it was wondering "what [was] going on with it." D.E. 58-8 at 7. In response, the chairman referred the question to the general counsel, apparently in an attempt to avoid potential *ex parte* communication issues (because the Board was ultimately responsible for approving the administrative judge's recommended order on the bid protest). *See id.* at 4–8. Nothing in that exchange reveals that the Board delegated decision-making authority to the general counsel over Southern Atlantic's bond.

More importantly, even if that exchange could be characterized as some form of delegation, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather,

11

the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are *not subject to review*." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (emphasis added).  No reasonable juror could find that the chairman's comments expressly delegated final, *unreviewable* authority over any and all matters related to the bond.

## C

Finally, Southern Atlantic maintains that, even if the School Board theoretically retained the power to review and reverse the assignment of the bond, such review was unavailable in this case because Wharton-Smith sued as assignee the day after the assignment was executed.  Citing *Holloman*, 370 F.3d at 1292, Southern Atlantic contends that the lack of a meaningful opportunity for review rendered Mr. Rodriguez the School Board's *de facto* final policymaker.  This argument, however, runs into several critical problems.

First, the assignment was not executed by Mr. Rodriguez, but by John Morris as "Chief Facilities Officer."  Southern Atlantic has not argued that Mr. Morris is a final policymaker for the School Board, so his actions cannot be imputed to the Board for § 1983 purposes.

Second, assuming Mr. Rodriguez was behind the assignment decision like Bertrand the monkey, *see Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (discussing "cat's paw" theory), and that the assignment was

12

actually an unlawful retaliatory act, his unlawful decision does not expose the Board to municipal liability because at no point was he authorized to set the overall policy for the Board's legal affairs. *See* D.E. 59 at 151 (explaining that the Board sets overall policy). Rather, the Board set policy and gave Mr. Rodriguez discretion to pursue legal recourses in conformity with that policy. The general counsel's decision to "exercise[ ] [his] discretion in an unconstitutional manner" is not the Board's "decision to act unlawfully." *Pembaur*, 475 U.S. at 483 n.12. And, as we have explained, the Board's failure to affirmatively intervene and reverse Mr. Rodriguez's decisions does not matter:

> Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. [This is] consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. . . . [T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.

*Scala v. City of Winter Park*, 116 F.3d 1396, 1400–01 (11th Cir. 1997) (internal quotation marks omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 129–30 (1988)).

Southern Atlantic's *Holloman*-based argument relies heavily on *Willingham v. City of Valparaiso Florida*, 638 F. App'x 903, 904 (11th Cir. 2016), but that case is distinguishable. In *Willingham*, a jury returned a verdict finding that the

13

mayor of the City of Valparaiso unlawfully fired a city police officer in retaliation for First Amendment conduct. *See id.* at 905. Although the mayor was responsible for personnel decisions on behalf of the city, the city charter empowered the city commission to review and overturn his decisions. *See id.* at 907–08. Despite review being "theoretically available on paper," the district court, relying on *Holloman*, ruled that the mayor's termination decision could be imputed to the city because he had "sabotaged the entire process of review over his own decision." *Id.* (quoting *Willingham v. City of Valparaiso*, 97 F. Supp. 3d 1345, 1354 (N.D. Fla. 2015)).

In affirming that decision, we explained that the mayor had "effectively prevented meaningful review" in a way that only he could because of his unique position:

> Since [the mayor] was [c]hairman of the [c]ity [c]ommission and controlled its agenda, the other [c]ommission members—*and therefore the [c]ommission as a whole*—were unable to force [him] to even entertain their motions [concerning the police officer's termination]. . . . As [c]hairman . . . , [the mayor's] conduct effectively nullified the [city charter's] very procedures designed to review [his] termination decision.

*Id.* at 907–08 (emphasis added).

In this case, by contrast, there is no evidence that the Board or the superintendent were powerless to review the general counsel's decisions. As the district court noted, even though the Board apparently ignored Southern Atlantic's

14

requests for the return of its bond, "nothing [in the record] support[s] the notion that the School Board could not have taken action had it wished to do so." D.E. 163 at 10. Similarly, nothing indicates that, had he wanted to, the superintendent could not have unilaterally intervened in the assignment of the bond after the general counsel made the initial call. Southern Atlantic seems to confuse the inability to exercise review with the choice not to. *Willingham* was about the former, and this case is about the latter.

## D

In sum, none of the theories advanced by Southern Atlantic establish municipal liability. There is no evidence that the Board had a custom of delegating final, unreviewable policymaking authority to the general counsel over litigation; that the Board expressly delegated final policymaking authority to Mr. Rodriguez over any issue related to Southern Atlantic's bond; and that there was no opportunity for either the Board or the superintendent to meaningfully review Mr. Rodriguez's decisions.

## IV

Mr. Hutchins and Mr. McIntosh also argue that the district court abused its discretion in awarding the School Board attorneys' fees under § 1988 because it erroneously concluded that their First Amendment retaliation claims were frivolous. The district court ruled that Mr. Hutchins' and Mr. McIntosh's claims

15

were frivolous because they had failed to present evidence that any alleged retaliatory act by the School Board was aimed at them specifically, as opposed to their company, Southern Atlantic.[1]

"[A] district court may in its discretion award attorneys' fees to a prevailing defendant in a . . . [§] 1983 action upon a finding that the plaintiff's lawsuit was 'frivolous, unreasonable, or without foundation.' " *Sullivan v. Sch. Bd. of Pinellas Cty.*, 773 F.2d 1182, 1188 (11th Cir. 1985) (quoting *Hughes v. Rowe*, 449 U.S. 5, 14 (1980)). "In determining whether a suit is frivolous, a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Id.* at 1189 (internal quotation mark omitted) (quoting *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981)).

On this record, we do not find that the district court abused its discretion. As we have noted before, frivolity at the summary judgment stage comes down to whether the plaintiffs produced evidence to support their claims. *See id.* at 1189. Here, assuming Mr. Hutchins and Mr. McIntosh even exercised any speech in their individual capacity, there is no evidence that the claim on the protest bond or the assignment to Wharton-Smith were in retaliation for their personal and individual

---

[1] Mr. Hutchins and Mr. McIntosh do not seem to appeal the summary judgment entered against their First Amendment retaliation claims. Either way, in deciding that the general counsel was not the School Board's final policymaker, we also foreclose their individual First Amendment retaliation claims against the School Board.

16

(as opposed to Southern Atlantic's) protected speech.  Both of those actions, it seems to us, were in response to Southern Atlantic's bid protest petition, which was not a petition that either of them joined in their individual capacity.   And both actions concerned a bond for which neither of them were principals (at least they do not contest this determination by the district court).  The School Board also never sued—whether through Wharton-Smith or otherwise—any of them, or sought fees against them in an administrative hearing.  In their own words, "[they] had their company's [b]ond attacked."  D.E. 70 at 15.  In light of this evidence, the district court's conclusion that they had no basis to sue was within its discretion.

## V

For these reasons, we affirm the district court's grant of summary judgment and award of attorneys' fees.

**AFFIRMED.**

17

JORDAN, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's conclusion that the general counsel was not the School Board's final policymaker, so there can be no municipal liability for the alleged retaliation. I believe, however, that the district court abused its discretion in awarding fees under 42 U.S.C. § 1988 because Mr. Hutchins' and Mr. McIntosh's First Amendment retaliation claims were not "groundless or without foundation." *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 421 (1978).

The district court awarded fees because Mr. Hutchins and Mr. McIntosh could not identify a retaliatory act against them specifically. That presupposes that the alleged retaliatory acts against Southern Atlantic, which the district court agreed were actually retaliatory, *see* D.E. 163 at 8, could not have also served as the retaliatory acts for Mr. Hutchins' and Mr. McIntosh's claims. Yet as far as I can tell, neither the School Board nor the district court pointed to any binding precedent that squarely forecloses a single retaliatory act from supporting two distinct claims arising from the same set of facts.

The only binding authority cited by the School Board is a Former Fifth Circuit case in which the court concluded that the shareholders of a bank lacked standing to assert civil rights claims in their individual capacities when "*only the bank ha[d] allegedly suffered any injury.*" *Gregory v. Mitchell*, 634 F.2d 199, 202

18

(5th Cir. 1981) (emphasis added).  That case does not stand for the proposition that a retaliatory act against a company can never support a First Amendment retaliation claim brought by the company's principals based on speech allegedly exercised in an individual capacity.  And, in any event, that case is distinguishable. Both Mr. Hutchins and Mr. McIntosh presented evidence that they suffered non-economic damages.

To be sure, there are, as the School Board says, cases that have found that non-economic damages are insufficient to confer standing on shareholders on the basis that those damages are not "distinct" from the company's.  *See, e.g.*, *Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721, 729 (8th Cir. 2001), *opinion reinstated*, 286 F.3d 498 (8th Cir. 2002).  But the cases cited are not binding.  And in *Audio Odyssey*, it was clear that the unlawful conduct was aimed *solely* at the company.  Here, the allegations are that the School Board specifically retaliated against Mr. Hutchins and Mr. McIntosh for their individual-capacity speech by going after their company.

There are also cases from other jurisdictions which gave Mr. Hutchins and Mr. McIntosh at least an arguable basis for asserting their own retaliation claims. For example, in *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), an individual plaintiff alleged that municipal officers, in retaliation for his public criticism, suspended bulk use permits belonging to his company.  *See id.* at 1314.

The district court had entered summary judgment against him on the ground that, like the bond in this case, the permits were the company's. *See id.* at 1314. The Ninth Circuit reversed and explained that, because the individual plaintiff "has a protected interest in commenting on the actions of government officials," if he "establish[es] that the decision to suspend the permits was made because of [his] exercise of constitutionally protected rights, [he has] established a first amendment violation, and [is] entitled to relief under [§] 1983." *Id.* The Seventh Circuit arrived at a similar conclusion in *Rasche v. Village of Beecher*, 336 F.3d 588 (7th Cir. 2003), when it declined to "disturb the district court's determination that [a business owner's] interest in [the] litigation [was] sufficient to give her standing to [assert, in her individual capacity, a First Amendment retaliation claim stemming from enforcement actions taken against her business]." *Id.* at 591 n.1. *See also White v. Sch. Bd. of Hillsborough Cty.*, 636 F. Supp. 2d 1272, 1279 (M.D. Fla. 2007) (refusing to dismiss a First Amendment retaliation claim asserted by the director of a school in her individual capacity for the alleged retaliatory actions of the school board against the school, and rejecting the school board's argument that the director lacked standing).

In light of these cases suggesting that Mr. Hutchins and Mr. McIntosh alleged a prima facie case of retaliation, and without a clear directive from our Circuit that their legal theory was utterly meritless, I do not think that their claims

20

were frivolous. *See, e.g.*, *Bonner v. Mobile Energy Servs. Co.*, 246 F.3d 1303, 1305 (11th Cir. 2001) (reversing award of attorneys' fees in part because the plaintiffs had established a prima facie case of discrimination, even though they lost at summary judgment). That is purposely a "stringent standard," *Head v. Medford*, 62 F.3d 351, 355 (11th Cir. 1995), because fees against civil rights litigants is a punishment we should seldom apply. *See Christiansburg*, 434 U.S. at 421–22.